IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| APPLIED UNDERWRITERS, Inc., a Nebraska corporation, and APPLIED RISK SERVICES, Inc., a Nebraska corporation, ) ) ) ) | |
| Plaintiffs,                    ) ) | 4:07CV3145 |
| v.                             ) ) | |
| EMPO CORPORATION, a Minnesota corporation, ) ) ) | MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS OR TO CHANGE VENUE |
| Defendant.                     ) ) | |

On May 1, 2007, Plaintiffs Applied Underwriters, Inc. (AUI) and Applied Risk Services, Inc. (ARS) filed a complaint against Defendant EMPO Corporation (EMPO) in the District Court of Douglas County, Nebraska. (See filing 1, Ex. 1.) The defendant filed a notice of removal on June 8, 2007. (See filings 1, 4.) Shortly thereafter, the defendant filed a motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), or, alternately, to transfer the case to another district pursuant to 28 U.S.C. § 1404(a). (See filing 9.) My analysis of the defendant's motion is set forth below.

### I.   BACKGROUND

The defendant is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. (Def.'s Index, filing 10, Ex. H, Reid Aff. ¶ 2.) Alan Reid, who serves as the Chief Executive Officer and President of Defendant EMPO, describes the defendant's business as "that of a Professional Employer Organization," or PEO.[1] (Id., Ex. H, Reid Aff. ¶ 2

---

[1]According to the defendant's brief, "EMPO's . . . clients include various businesses with employees for whom the businesses wish to provide employee benefits, health insurance, retirement plans, workers' compensation, and other services. Through a PEO relationship, EMPO becomes the legal employer of the entity that provides the services and benefits to the businesses and employees." (Def.'s Br., filing 11, at 2 (citations omitted).) I note, however, that

1

n.1.)  "Virtually all of EMPO's 126 clients are located in Minnesota," and "[n]one are located in Nebraska."  (Id.)

The plaintiffs are Nebraska corporations with their principal places of business in Omaha, Nebraska.  (Def.'s Index, filing 10, Ex. E, ¶ 1; id., Ex. C; Pls.' Index, filing 12, Brown Aff. ¶ 2.)  The plaintiffs also have an office in San Francisco, California.  (E.g., Def.'s Index, filing 10, Ex. C; filing 12, Brown Aff. ¶ 6.)  According to Todd Brown, who describes himself as an employee of AUI with "personal knowledge," AUI is "the corporate parent of" ARS.  (Pls' Index, filing 12, Brown Aff. ¶ 1.)

In March 2001, Harvey Topitz of Tanenbaum-Harber Co., Inc., a New York insurance brokerage firm, contacted AUI "seeking to place workers' compensation insurance for its client EMPO."  (Filing 12, Brown Aff. ¶ 5; filing 12, Ex. 1.)  Topitz's "submission for EMPO Corporation" was addressed to Carl DeBarbrie at "Applied Underwriters" in San Francisco, California.  (See filing 12, Brown Aff. ¶ 5; filing 12, Ex. 1.)  In response to Toptiz's request, AUI "caused a proposal . . . for workers' compensation coverage to be issued to EMPO."  (Filing 12, Brown Aff. ¶ 6.)  This proposal, which is dated May 8, 2001, issued from the "Home Office" of "Applied Underwriters" in San Francisco, California.  (See filing 12, Ex. 2, at 1.)  Brown states, "While the initial proposal was issued from Plaintiffs' office in California, all of the substantive work was to be performed at Plaintiffs' office in Omaha, Nebraska."  (Filing 12, Brown Aff. ¶ 6.)  The proposal itself, however, includes no mention of work to be performed in Nebraska.  (See filing 12, Ex. 2.)  Indeed, the proposal does not indicate that the plaintiffs maintained an office in the State of Nebraska.  (See id.)

EMPO accepted the proposal, and the plaintiffs issued a workers' compensation insurance policy from Virginia Surety Company[2] to EMPO and its clients.  (Filing 12, Brown

---

this description of the defendant's business does not appear in the evidence cited by the defendant.  (See id. (citing Def.'s Index, filing 10, Ex. H, Reid Aff. ¶ 2 n.1, ¶ 3).)  An affidavit submitted by the plaintiffs describes PEOs quite differently.  (See Pls.' Index, filing 12, Brown Aff. ¶ 5.)  Specifically, the plaintiffs' affiant states that "[a] PEO maintains individuals on its payroll and leases those individuals to clients."  (Id.)

[2]"ARS was a managing general agent for Virginia Surety Company ("VSC") and [was] authorized to collect premium[s], issue workers' compensation policies, and adjust claims on

Aff. ¶ 7.)  This policy was in effect from May 10, 2001, through May 10, 2002.  (Id.)  It was then renewed, under a different policy number, for the period from May 10, 2002, through May 10, 2003.  (Id.)  According to Brown, these "policies were issued by ARS in Omaha, Nebraska." (Id.)  According to Reid, however, the "workers' compensation policy was sent to EMPO's offices in Minnesota from Plaintiff's headquarters in California . . . and had no connection to Nebraska."  (Def.'s Index, filing 10, Ex. H, Reid Aff. ¶ 5.)  The policies themselves list the "Producer" as "Applied Underwriters" of San Francisco, California, (filing 15, Hall Aff., Ex. A-1 at 1; id., Ex. A-2 at 16), and seem to include no mention of the State of Nebraska..

In his affidavit, Brown states that "[e]ach month from May 10, 2001[,] through May 10, 2003, premium payments from EMPO for its workers' compensation policies were processed in Omaha, Nebraska."  (Filing 12, Brown Aff. ¶ 8.)  The defendant has produced photocopies of most of these payment checks, however, and each of these checks was made payable to "Applied Underwriters" of San Francisco, California.  (See filing 14, Reid Aff. ¶ 4 & Ex. A.)  In other words, the defendant mailed its payments to the plaintiffs' California office, but, according to Brown, the payments were "processed" in Nebraska.  There is no indication that the defendant had knowledge of, or control over, the plaintiffs' decision to process the payments in Nebraska.

Brown also states that "[a]ll customer service questions from EMPO and its clients were directed to ARS' office in Omaha, Nebraska, and [were] responded to by customer service representatives in Omaha, Nebraska."  (Filing 12, Brown Aff. ¶ 8.)  He adds that "[r]equests for certificates [of insurance] were made by EMPO to Plaintiffs' offices in Omaha, Nebraska"; that "[a]ll claims from May 10, 2001 through May 10, 2003 from EMPO and/or its clients were submitted to ARS for claim processing in Omaha, Nebraska"; and "all claim checks were processed, issued, and forwarded from ARS' office in Omaha, Nebraska."  (Id.)  In reply, Reid states that when the initial policy went into effect, the defendant was instructed to fax claims to George Horant (and later Keri Perkins) using a toll-free number, and requests for certificates of insurance were to be sent to Jeana Walker at AUI in San Francisco.  (Filing 14, Reid Aff. ¶ 10.)

---

behalf of VSC."  (Filing 12, Brown Aff. ¶ 3.)  VSC is an Illinois company.  (See filing 15, Hall Aff., Ex. A-1 at 1.)  A policy endorsement later changed the carrier from VSC to Combined Specialty Insurance Company, which, like VSC, is an Illinois company.  (See id., Ex. A-2 at 15.)

The defendant's "[c]lients were given a toll-free customer service number or an alternative number with a 402 area code, which did not identify the state." (Id.)[3] "At the completion of the second policy year, EMPO was told to send certificate requests to a Michael Brown at a '402' area code number," but the defendant was not made aware that this area code corresponded to a Nebraska location. (Id. ¶ 11.) On April 8, 2003, the defendant did send a "Work Comp Certificate Request" via facsimile to a Michael Brown using a number with a 402 area code. (See filing 12, Ex. 3.) On that same date, Michael Brown sent to the defendant a facsimile with a caption stating, "Applied Underwriters, Midwest Service Center, P.O. Box 3606, Omaha, NE, 68103." (Filing 12, Ex. 4; see also filing 12, Brown Aff. ¶ 8.)

On May 1, 2007, the plaintiffs filed a complaint alleging that the insurance policies described above included "a profit sharing component whereby Defendant would participate in profit and losses generated by the workers' compensation policies provided to Defendant." (Def.'s Index, filing 10, Ex. E, ¶ 5.) The plaintiffs claim that the defendant owes them $468,040.60 under this profit sharing plan. (Def.'s Index, filing 10, Ex. E, ¶¶ 5-6.) The defendant has moved to dismiss the complaint or, alternately to transfer the case to the District of Minnesota. (See filing 9.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(2) provides that a defendant may move to dismiss a complaint for lack of personal jurisdiction. "To determine whether a court has personal jurisdiction over a nonresident defendant, [the court must] ask two questions: (1) whether the applicable long-arm statute . . . is satisfied; and (2) whether a court's exercise of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment." Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co., Inc., 63 F.3d 694 (8th Cir. 1995). Because Nebraska's long-arm statute confers personal jurisdiction to the "to the fullest extent permitted by the United States Constitution," my analysis need only focus on whether the exercise of personal jurisdiction over the defendant would violate the Due Process Clause. Stanton v. St. Jude Medical, Inc., 340

---

[3]I take judicial notice of the fact that the 402 area code covers much of Nebraska, including the City of Omaha.

4

F.3d 690, 693 (8th Cir. 2003) (citing Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 612 (8th Cir. 1994)); see also Wagner v. Unicord Corp., 526 N.W.2d 74, 77-78 (Neb. 1995).

Due process requires that a non-resident defendant have sufficient "minimum contacts" with the forum state "such that the maintenance of the suit [in that state] does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). There are two "theories for evaluating minimum contacts[:] general jurisdiction and specific jurisdiction." Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1073 (8th Cir. 2004). "Under the theory of general jurisdiction, a court may hear a lawsuit against a defendant who has 'continuous and systematic' contacts with the forum state, even if the injuries at issue in the lawsuit did not arise out of the defendant's activities directed at the forum." Id. (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984)). "In contrast, specific jurisdiction is viable only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state." Id. (citing, inter alia, Hall, 466 U.S. at 414). Under either theory, the defendant must have committed "some act by which the defendant purposely avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-76 (1985). "This purposeful availment must be sufficient to provide the defendant with fair warning that his activities might result in his being hailed into court in that jurisdiction." Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006).

The Eighth Circuit has instructed the district courts to consider the following factors when determining whether a defendant's contacts with a state are sufficient to support the exercise of personal jurisdiction:

> (1) the nature and quality of [a defendant's] contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) [the] convenience of the parties.

Dever, 380 F.3d at 1073-74 (quoting Burlington Indus. v. Maples Indus., Inc., 97 F.3d 1100, 1102 (8th Cir. 1996)). The first three of these factors are to be given significant weight, though

5

factor three may not apply under the general jurisdiction theory. See id. (citing Burlington Indus., 97 F.3d at 1102; Hall, 466 U.S. at 414-15).

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff 'must state sufficient facts in the complaint to support a reasonable inference that [the defendant] can be subjected to jurisdiction within the state. Once jurisdiction ha[s] been controverted or denied, [the plaintiff] ha[s] the burden of proving such facts.'" Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1072 (8th Cir. 2004) (quoting Block Indus. v. DHJ Indus., Inc., 495 F.2d 256, 259 (8th Cir. 1974)). "[J]urisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). To meet its burden in opposition to a motion to dismiss, however, the plaintiff must make a prima facie showing of jurisdiction. See id. To make this showing, the plaintiff cannot simply rely upon the allegations of the complaint, but must submit affidavits or other exhibits to establish personal jurisdiction. Dever, 380 F.3d at 1072-73. "If the district court does not hold an evidentiary hearing and instead relies on pleadings and affidavits . . . the court must look at the facts in the light favorable to the nonmoving party, . . . and resolve all factual conflicts in favor of that party." Dakota Indus., Inc., 946 F.2d at 1387 (citations omitted).

### III. ANALYSIS

The evidence submitted by the parties shows that the defendant did not purposely avail itself of the privilege of conducting activities within Nebraska. Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1073 (8th Cir. 2004). The defendant did not have fair warning that its activities might result in its being hailed into court here. Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006).

Preliminarily, I note that the evidence shows clearly that the plaintiffs cannot establish personal jurisdiction over the defendant using the "general jurisdiction" theory. Indeed, the plaintiffs argue that "[t]he basis for jurisdiction in the instant case is specific personal jurisdiction." (Pls.' Br., filing 12, at 12.)

In support of its argument that specific personal jurisdiction exists, the plaintiffs rely

upon seven specific contacts (or types of contacts) that, in the plaintiffs' view, establish that the defendant purposely availed itself of the privilege of conducting business in Nebraska.  (See Pls.' Br., filing 12, at 7-8, 10, 14.)  I shall describe and evaluate "the nature and quality" of these contacts below–first individually, and then "in the aggregate."  Northwest Airlines, Inc. v. Astraea Aviation Services, Inc., 111 F.3d 1386, 1390 (8th Cir. 1997) (citations omitted).

     First, the plaintiffs argue that on April 8, 2003, the defendant transmitted a request for certificates of insurance to a fax number with a 402 area code, and the plaintiffs responded later that same day.  (See Pls.' Br., filing 12, at 7-8 (citing filing 12, Exs. 3-4).)  Although this evidence is uncontradicted, the defendant has submitted evidence establishing that EMPO was originally instructed to send requests for certificates of insurance to the plaintiffs' office in San Francisco; that the defendant was not instructed to send these requests to a fax number with a 402 area code until "the completion of the second policy year"; that the fax number with the 402 area code was accompanied by a toll-free number; and that the number with the 402 area code "was not identified to be Omaha, Nebraska."  (Filing 14, Reid Aff. ¶¶ 10-11.)  In light of this evidence, "the nature and quality" of this contact is clearly insufficient to justify the exercise of personal jurisdiction.  The defendant did not purposely avail itself of the privilege of conducting business in Nebraska through this facsimile contact.  Indeed, apart from an unidentified area code, there is no indication that the defendant knew (or could have known) that it had been asked to contact the plaintiffs' "Midwest Service Center" in Nebraska to obtain the certificates.  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (explaining that the Due Process Clause requires that individuals have "fair warning" that their actions might subject them to jurisdiction in a foreign state).  Moreover, the defendant had no control over the plaintiffs' decision to cease fielding requests for certificates in California and field them instead in Nebraska, and it is well-established that this sort of "unilateral activity . . . is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."  Helicopteros Nacionales de Colombia, S.A., v. Hall, 466 U.S. 408, 417 (1984).  See also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 n.17 (1985) (citing examples of unilateral activities that do not support the exercise of personal jurisdiction over an out-of-state defendant).  In addition, I note that communications via phone, mail, or the

like generally do not establish "minimum contacts" for the purposes of personal jurisdiction. E.g., Johnson v. Woodcock, 444 F.3d 953, 956 (8th Cir. 2006) (quoting Porter v. Barall, 293 F.3d 1073, 1076 (8th Cir. 2002)).

   Second, the plaintiffs argue that they sent profit sharing calculations and audit statements to EMPO from their office in Omaha, Nebraska. (See Pls.' Br., filing 12, at 8 (citing filing 12, Exs. 6-7).) The fact that the plaintiffs sent documents to the defendant from Nebraska, however, does not establish that the defendant purposely availed itself of the privilege of conducting business in Nebraska. As I noted above, this sort of "unilateral activity" by the plaintiffs cannot be used to justify hailing a defendant into court in Nebraska, see Hall, 466 U.S. at 417, and letter communications, without more, are insufficient to establish personal jurisdiction over a nonresident defendant, see Johnson, 444 F.3d at 956.

   Third, the plaintiffs argue that "[t]here was considerable communication with Shari Michealson at Plaintiffs' offices in Omaha concerning the workers' compensation policies at issue after expiration of the workers' compensation policies but before this litigation was filed." (Pls.' Br., filing 12, at 8 (citing filing 12, Ex. 8).) There is evidence that Ms. Michaelson and Jonathan Hall of EMPO exchanged several emails between November 20, 2006, and June 12, 2007. (See filing 12, Ex. 8.) It seems that Mr. Hall contacted Ms. Michaelson to address an error that appeared in reports filed by the plaintiffs with the National Council on Compensation Insurance (NCCI). (See filing 15, Hall Aff., ¶ 5; filing 12, Ex. 8.) Standing alone, however, these emails are insufficient to establish personal jurisdiction over the defendant in Nebraska. Cf. Johnson, 444 F.3d at 956; Northwest Airlines, Inc. v. Astraea Aviation Services, Inc., 111 F.3d 1386, 1390 (8th Cir. 1997) ("Phone calls into a state are . . . a relevant contact, although they . . . do not in themselves establish personal jurisdiction.").

   Fourth, the plaintiffs argue that "EMPO transacted business in Nebraska by accepting a workers' compensation proposal issued from Omaha, Nebraska." (Pls. Br., filing 12, at 10.) This argument is contradicted by the plaintiffs' own evidence, as Brown's affidavit states that "the initial proposal was issued from Plaintiffs' office in California." (Filing 12, Brown Aff., ¶ 6.) Although Brown adds that "all of the substantive work was to be performed at the Plaintiffs' office in Omaha, Nebraska," (id.), there is no indication that the defendant was made aware of

8

the plaintiffs' intention to perform "substantive work" in Nebraska. Indeed, as neither the proposal nor the insurance policies mention Nebraska, it is difficult to see how the defendant could have known that work would be performed in Nebraska. Thus, the plaintiffs' unilateral, undisclosed decision to perform "substantive work" in Nebraska cannot provide a basis for exercising personal jurisdiction over the defendant in Nebraska.

Fifth, the plaintiffs argue that the defendant "directed customer service inquiries to Omaha, Nebraska." (Pls.' Br., filing 12, at 10.) This may well be true; however, undisputed evidence shows that the defendant's clients were instructed to place customer service calls to either a toll-free number or a number with a 402 area code, and there was no indication that the 402 area code was associated with Nebraska. (See filing 14, Reid Aff. ¶ 10.) As noted above, telephone calls, standing alone, are insufficient to establish personal jurisdiction, and an alternate contact number with a 402 area code is simply insufficient to give the defendant fair warning that it might be hailed into court in Nebraska. Thus, the customer service calls, by their nature, cannot be used to establish personal jurisdiction over the defendant in Nebraska.

Sixth, the plaintiffs argue that claims were submitted to and adjusted in their Omaha, Nebraska, office. (See Pls.' Br., filing 12, at 10.) There is no evidence, however, that the defendant was aware that claims were submitted to an office in Nebraska;[4] nor is there evidence that the defendant knew that the claims would be adjusted or otherwise "processed" in Nebraska. (See filing 15, Hall Aff. ¶ 2 (citing Hall Aff., Ex. A).) Under the circumstances, it cannot be said that the defendant had fair warning that it might be subject to suit in Nebraska.

Finally, the plaintiffs argue that premium payments were processed in Omaha, Nebraska. (Pls.' Br., filing 12, at 14.) Again, however, there is no evidence that the defendant was aware that its payments were being processed in Nebraska. On the contrary, the evidence shows that the defendant made its premium payments to "Applied Underwriters" of San Francisco, California. (Filing 14, Reid Aff. ¶ 4 & Ex. A.) The plaintiffs' decision to process these payments in Nebraska without the defendant's knowledge is the sort of unilateral action that cannot be used to establish that the defendant purposely availed itself of the privilege of doing

---

[4]The defendant's uncontradicted evidence establishes that the defendant was instructed to fax claims to a toll-free number. (See filing 15, Hall Aff. ¶ 2.)

business in Nebraska.

For the reasons set forth above, it is clear that when the defendant's contacts with the State of Nebraska are considered individually, the "nature and quality" of these contacts do not justify the exercise of personal jurisdiction over the defendant in Nebraska. These contacts remain insufficient when considered in the aggregate. When the defendant entered into business with the plaintiffs, it had every reason to believe that it was engaged in business with a company or companies headquartered in California, and it had no reason to believe that it was engaging in business with a company or companies that had a presence in Nebraska. Although the plaintiffs may have performed relevant work in the State of Nebraska, there is no evidence that the defendant had any reason to know or expect that the plaintiffs might perform work in Nebraska. Furthermore, all of the defendant's contacts with Nebraska came after the business relationship was already consummated, and all of these contacts were in the form of telephone, facsimile, or email communications–with nothing more than a 402 area code indicating that the telephone or fax communications reached into Nebraska. The defendant did not purposely avail itself of the privilege of doing business in Nebraska, and it clearly did not have fair warning that its dealings with the plaintiffs might result in its being hailed into court here.

I have also considered the remaining factors cited by the Eighth Circuit in <u>Dever v. Hentzen Coatings, Inc.</u>, 380 F.3d 1070, 1073 (8th Cir. 2004), and I find that these factors do not alter my conclusion that the exercise of personal jurisdiction over the defendant in Nebraska would be inconsistent with "traditional notions of fair play and substantial justice." <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945) (quoting <u>Milliken v. Meyer</u>, 311 U.S. 457, 463 (1940)). First, if the defendant's contacts with the plaintiffs' Nebraska "service center" were numerous (and there is no specific evidence on this point), the fact that the defendant seems to have made all, or almost all, of these contacts without knowing that it was contacting Nebraska weighs more heavily in my analysis. Second, I note that the relation between the plaintiffs' cause of action and the defendant's contacts with Nebraska is unclear. In their brief, the plaintiffs argue repeatedly that their claim against the defendant is based upon the defendant's alleged failure to pay premiums for workers' compensation insurance, (<u>see, e.g.</u>, Pls.' Br., filing 12, at 1, 4, 12, 14), and it is true that the defendant's alleged contacts with Nebraska all appear to relate to

the insurance policies. The complaint, however, does not allege that the defendant failed to pay the insurance premiums; instead, it alleges that the defendant has failed to pay losses calculated under a profit-sharing plan. (See Def.'s Index, filing 10, Ex. E, ¶¶ 5-7.) This plan is rarely mentioned in the plaintiffs' brief, and the policies do not seem to include "profit-sharing" terms. Thus, it is difficult to assess whether the defendant's contacts with Nebraska have a relationship with the injury alleged in the complaint. Finally, after due consideration, I find that Nebraska's interest in providing a forum for its residents and the convenience of the parties do not justify the exercise of personal jurisdiction over the defendant in Nebraska.

The plaintiffs argue that the instant case is analogous to Centurion Wireless Technologies, Inc. v. Hop-On Communications, Inc., 342 F. Supp. 2d 832 (D. Neb. 2004), and Roth Grading Inc. v. Stephens MDS, No. 8:06cv724, 2007 WL 1291149 (D. Neb. March 20, 2007). (See Pls.' Br, filing 12, at 13-14.) In Centurion, the court held as follows:

> However, I find that all of the factors in this case, when viewed in their entirety, suggest that Hop-On could reasonably anticipate being forced to defend in Nebraska. First, Hop-On decided to reach out to a Nebraska company. Second, the act of copyright infringement that is alleged is an intentional act directed at the creator of the antennas. . . . While the defendant in Lindgren [v. GDT, LLC, 312 F. Supp. 2d 1125 (S.D. Iowa 2004)] could at least claim there was no intentional act targeted at the Iowa plaintiff, Hop-On's conduct in this case puts it beyond all doubt that the design of Centurion was "targeted" and the question to be decided was whether it was targeted in an illegal manner. Furthermore, the manufacture of future antennas covered by the contract was to occur in Nebraska, Malaysia, or China. The harm alleged by Centurion was suffered in Nebraska. Hop-On made the design contract with Centurion with full knowledge of its location in Nebraska, made the initial $10,000 payment, and continued correspondence with Centurion in the state of Nebraska by mail and telephone. Therefore, it is evident that its effort in reaching out to Centurion to contract for a purchase of antenna designs amounts to "transacting business" in Nebraska.

342 F. Supp. 2d at 837-38. Centurion is clearly distinguishable from the instant case. Here there is no evidence that the defendant "decided to reach out to a Nebraska company." More specifically, there is no evidence that the defendant intentionally targeted a Nebraska company for harm; the documents in evidence do not indicate that there would be performance in Nebraska; and there is no evidence that the defendant entered into a business relationship with the plaintiffs "with full knowledge of [their] location in Nebraska." Centurion is inapposite.

11

The plaintiffs' reliance on Roth Grading Inc. is also misplaced. There the court stated,

> When I consider the nature and quality of the Stephens MDS's contacts in relation to the cause of action, I conclude that its admittedly minimal contacts are sufficient to support an exercise of personal jurisdiction over it without a violation of its due process rights. When the nature of Stephens's contacts with Nebraska, including initiating the contact with IRT, negotiating for the purchase of the Impactor and an option to purchase a second Impactor, sending an unexecuted and an executed version of the purchase order to IRT's office, inquiring about the possible purchase of a trailer, inducing reliance to manufacture the Impactor in Nebraska, and inducing Roth to deliver the Impactor in Georgia, are considered together, these contacts support a finding that Stephens MDS had sufficient notice that it might be hailed into court in Nebraska on disputes related to the transaction involving the Impactor.

2007 WL 1291149, at *3. Here, in contrast, the defendant's agent contacted the plaintiffs' California office, which was described as the plaintiffs' "home office" in their own proposal, (see filing 12, Ex. 2, at 1), and the defendant obtained policies produced by "Applied Underwriters" in San Francisco, California, (filing 15, Hall Aff., Ex. A-1 at 1; id., Ex. A-2 at 16). The defendant did not initiate contact with the plaintiffs in Nebraska, and there is no indication that the defendant had notice that the plaintiffs would perform relevant work in Nebraska. As I have explained above, the defendant simply did not have sufficient notice that it might be hailed into court in Nebraska on disputes related to its dealings with the plaintiffs.

Personal jurisdiction over the defendant is lacking, and the complaint will be dismissed on that ground. As a result, there is no need to consider whether venue is proper in this district or whether the case ought to be transferred pursuant to 28 U.S.C. § 1404(a).

**IT IS ORDERED** that the defendant's motion to dismiss the complaint for lack of personal jurisdiction, filing 9, is granted. In all other respects, the defendant's motion is denied as moot.

Dated October 10, 2007.

                BY THE COURT

                s/ Warren K. Urbom
                United States Senior District Judge